## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 22-cr-320 (JMC)** |
| **v.** | : | |
| | : | |
| **ANTONIO LAMOTTA,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Antonio Lamotta, to 21 months of imprisonment, at the midpoint of Lamotta's advisory Guidelines range, three years of supervised release, restitution of $2,000, and a mandatory assessment of $120 (consisting of $100 for Count 1, and $10 for each of Counts 4 and 5).

### I.    INTRODUCTION

The defendant, Antonio Lamotta, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

1

Lamotta, a 65-year-old security worker and United States Army veteran, entered the Capitol through the Rotunda Doors on January 6, 2021, despite seeing numerous rioters exiting the building and officers in the doorway attempting to close the doors to prevent the entry of any additional rioters. Once inside, Lamotta pushed forward in the direction of the Rotunda, turned to the rioters behind him and waved them forward. While at the front line of a group of rioters, Lamotta used his shoulders, elbows, and hands to push against police officers. He also linked arms with another rioter in an attempt to hold his ground.

At about 3:30 p.m., after Lamotta had been inside the Capitol building for nine minutes, rioters just outside the Rotunda Doors threw objects at the police officers near the doorway and tackled one of them. Lamotta, then standing just inside in the doorway, watched the police drag an injured officer inside and attempt to pull the doors shut to shield themselves from the assault. Lamotta again interfered with the police by wedging himself in the doorway and holding it open, exposing the officers to continued violence. While holding the door open, Lamotta also used his hand to motion additional rioters outside to enter the building. Police officers finally forced Lamotta out of the building shortly thereafter.

The government recommends that the Court sentence Lamotta to 21 months of incarceration, which would acknowledge the gravity of Lamotta's conduct and fairly reflect his participation in the events of January 6.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to pages 1-2 of the Statement of Facts filed in this case, ECF No. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Antonio Lamotta's Role in the January 6, 2021 Attack on the Capitol

*Pre-January 6 Statements and Relevant Conduct*

In the months before the events of January 6, 2021, Lamotta used Facebook to make violent and incendiary comments about the 2020 presidential election, regularly invoking "civil war." On September 8, 2020, Lamotta posted comments on Facebook saying, "Biden and Kamala won't win…" and "Trump will win by a landslide… and we may have to fight an all-out civil war." (Tr. Ex. 301.) On September 20, he added, "corrupt politicians … if the patriots move right, it's a quick take-over. Hang them all high." (Tr. Ex. 306.) On October 9, he posted, "We need strong-men, this is real war after the election…if shit hits the fan." (Tr. Ex. 310.)

On November 5, as votes for the 2020 presidential election were being counted, Lamotta traveled from Virginia to Pennsylvania with his friend and colleague Joshua Macias. Lamotta messaged three others to say he was "Going to PA" to "ambush" or "raid" "fake ballots." (Tr. Exs. 501, 313, 314). There, as he told an FBI agent, he planned to "ensure the integrity of the ballot counting for the Presidential election." Lamotta was subsequently arrested and convicted of illegally carrying a firearm into Philadelphia.[2]

---

[2] Lamotta was acquitted at trial of his election interference charges.

As Congress's certification of the vote drew closer, Lamotta made further comments anticipating violence, and specifically, the implementation of martial law on January 6. In a Facebook conversation with a friend on December 19, 2020, he wrote: "Get connected with other neighborhood watch group… in case you need their help.and vise-versa [sic]. Martial Law in Jan.6." (Tr. Ex. 319.1.) When the friend asked Lamotta, "What will exactly happen if trump pulls martial law … ?" Lamotta responded "Follow Vets for Trump… by Joshua Macias (founder)… He's got direct connections with DC generals." (Tr. Ex. 319.) On December 23, Lamotta posted that, "law makers…been twisting the Constitution…The American-Patriots will not watch this without a fight." (Tr. Ex. 322.)

*Conduct on January 6*

On January 5, 2021, Lamotta attended a rally in Washington D.C. where he stood across the street from the United States Capitol building. There, he was able to observe bike rack fencing that had been recently erected on the Capitol Grounds.

The next morning, January 6, Lamotta and Macias attended the Freedom Rally two blocks North of the Capitol Building on Capitol Grounds. Lamotta then walked with Macias to the Capitol building, serving as his bodyguard. Lamotta had a long history of experience in the security industry, having worked for years as a security provider and having provided personal security for Virginia State Senator Amanda Chase.

The perimeter around the Capitol grounds consisted of linked bicycle racks and snow fencing. United States Capitol Police had posted signs on those barriers that read: "Area closed by order of United States Capitol Police."

Lamotta and Macias walked past those barriers and onto the Capitol grounds. Lamotta stood feet away from Macias as he gave a speech to the crowd. In his speech, Macias said "Mike Pence is a Benedict Arnold. We believed in you, Vice President. We had hope that you would do what's right for our Constitution. I stood with you on stage, sir. I believed in you. You backstabbed the veterans. You backstabbed these patriots. That's why we're here." He also called for veterans to defend the Constitution from foreign and domestic enemies and said, "those domestic enemies are here." (Tr. Ex. 601.)

Following Macias's speech, Lamotta and Macias climbed the East Rotunda steps and stood amid the crowd of rioters on the portico outside the Rotunda doors for several minutes. There, Lamotta saw rioters streaming out of the building while police officers stood in the doorway. He also saw those officers attempting to close the doors to prevent the entry of additional rioters.

At 3:21 p.m., Lamotta breached the Capitol building through the Rotunda doors, walking past panes of broken glass while a blaring alarm sounded. *See Image 1.* He did so amid a chaotic scene, while pepper spray and bear mace filled the air. Macias did not enter the Capitol with him.



*Image 1: A screenshot showing Lamotta as he entered the Capitol amid the riotous crowd. (Tr. Ex. 606 at 0:00).*

Once inside the building, Lamotta remained there, in defiance of police commands, for approximately nine minutes. He moved as far into the building as he could go. He made a beeline for the Rotunda but was stopped by a line of police officers. For the first of two times, Lamotta turned his back to the crowd, waved his hand overhead, and beckoned the mob to push forward, furthering the chaos around him.

Officer Christopher Owens and others from the Metropolitan Police Department (MPD) attempted to push Lamotta towards the door. Their attempt was not successful. Instead of complying, for a second time, Lamotta again turned and waved for the crowd to push further inside. *See Image 2.*



*Image 2: A screenshot from CCTV shows Lamotta waving toward the crowd. (Tr. Ex. 101 at 3:22:03).*

One officer attempted unsuccessfully to get Lamotta to leave, pushing her baton against his body and shouting at him to "Get out!" *See Image 3.*



*Image 3: A screen shot from an officer's body worn camera shows the moment the officer pushed against Lamotta and yelled to him, "Get out!" (Tr. Ex. 205 at 3:23:03).*

Yet another MPD police officer with a shield pushed against Lamotta as well.   Lamotta

resisted the officers' attempts to remove him and moved further into the Capitol. He made it as far as the doorway to the Rotunda, where he was stopped by a group of police officers coming the other way. As those officers advanced out of the Rotunda, the mob was forced backward, toward the exit. In an act of defiance, Lamotta locked arms with another rioter, trying to hold his ground. *See Image 4.*



*Image 4: A screenshot from an open-source video shows Lamotta linking arms with another rioter in defiance of police efforts to remove him from the building. (Tr. Ex. 610 at 3:24:22).*

While the officers continued to move the mob back, Lamotta leaned against them, pushing his forearm against the officers. *See Image 5.*



*Image 5: A screenshot from an open-source video shows Lamotta using his elbow to physically resist officers' efforts. (Tr. Ex. 610 at 3:24:27).*

While there were certainly isolated times when Lamotta could not move because of the crowd around him, there is no question that Lamotta could have left the Capitol had he chosen to do so.

At 3:30 p.m., Lamotta watched as two officers struggled to prevent other rioters from entering the building by trying to close the Rotunda doors. Lamotta saw the officers' attempts to use the doors to keep the rioters out of the building. He also saw those officers pull the body of an injured police officer through the doorway and into the building.

Despite being aware that the officers in the doorway were in danger, Lamotta pushed his forearm against one of the doors, holding it open. In doing so, Lamotta forcefully opposed the officers' attempts to keep rioters out of the building. At the same time, Lamotta used his hand that was holding the door to wave towards the rioters, encouraging them to forcefully enter the building. *See Image 6*



*Image 6: A screenshot from CCTV shows Lamotta holding the East Rotunda Doors open and waving to the crowd as police officers try to hut it. (Tr. Ex. 102 at 3:30:08).*

Ultimately, after Lamotta had been inside the Capitol for approximately nine minutes, a police officer was able to forcefully push him outside through the Rotunda doors.

*Lamotta's Post-January 6 Statements*

After leaving Capitol grounds on January 6, Lamotta posted a message on Facebook that read, "All right, when do we build the horse?" (Tr. Ex. 324.) That reference to the Trojan Horse of Greek mythology—an instrument of warfare and violent sabotage—illustrated Lamotta's goal of engaging in violent action against the government that continued after January 6.

On January 10, 2021, Lamotta posted on Facebook about deleting evidence of his actions on January 6, stating, "I had to jettison my pics… The feds were investigating us… lol." (Tr. Ex. 327.)

## III.    THE CHARGES AND CONVICTIONS

On September 29, 2023, a federal grand jury returned a superseding indictment charging

Lamotta with violating: 18 U.S.C. § 231(a)(1) (civil disorder) (Count One); 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds) (Count Two); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds) (Count Three); 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Four); and 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Five). On March 21, 2024, following a bench trial, this Court convicted Lamotta of Counts One, Four, and Five, and acquitted him of Counts Two and Three.

## IV.    STATUTORY PENALTIES

Lamotta now faces sentencing for the three counts of conviction.  As noted in the Presentence Report, Lamotta faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine of $250,000, restitution, and a mandatory special assessment of $100 as to Count One; six months of imprisonment, a fine of $5,000, restitution, and a mandatory special assessment of $10 as to Counts Four and Five. PSR ¶¶ 104-05, 110-11, 117-18, 127-30.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Presentence Report ("PSR") calculations of the Sentencing Guidelines. As the PSR correctly found, Lamotta's offense level computation for Count One—which drives Lamotta's overall offense level—is as follows:

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |

Total Adjusted Offense Level:  13

*See* PSR ¶¶ 23-36.

Counts Four and Five are not subject to the Guidelines because they are Class B misdemeanors.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Lamotta is not a "zero-point offender."

The U.S. Probation Office calculated Lamotta's criminal history as category III. PSR ¶ 40. Accordingly, Lamotta's Guidelines imprisonment range is 18 to 24 months' imprisonment. PSR ¶ 106.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Lamotta's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Lamotta not only entered the Capitol, but consistently refused to leave. He used his body to resist police efforts to clear the area he occupied and, even after

12

seeing officers in physical danger, held the East Rotunda Doors open and motioned other rioters inside the Capitol. The nature and circumstances of Lamotta's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 21 months.

### B. Lamotta's History and Characteristics

Lamotta is a U.S. Army veteran with a long history of work in the physical security industry. PSR ¶¶ 83-87. Lamotta also has a significant history of arrests and convictions that weighs in favor of a serious period of incarceration:

- In 2012, Lamotta was charged with Criminal Possession, 4th Degree- Firearm. The cause was conditionally discharged, and Lamotta was fined $500. PSR ¶ 38.

- In 2020, Lamotta was charged with, and convicted at trial of, one count of Carrying a Firearm without a License (felony) and one count of Carrying a Firearm in Public (misdemeanor) after Lamotta traveled to a vote-counting center in Philadelphia on November 5, 2020, shortly after the 2020 presidential election, while carrying firearms. Lamotta was sentenced to 11 and a half to 23 months incarceration and 2 years of probation on count one, and 4 years of probation, with immediate parole, on count two. PSR ¶ 39.

- Lamotta also has several traffic violations and a simple assault charge that was dismissed in 2003. PSR ¶¶ 41-47.

Lamotta's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a history of other offenses. Lamotta's history and characteristics, including his history of arrests and convictions and history of violent rhetoric, weigh heavily in favor of a substantial term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Lamotta's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The courts must send a clear message to the American public that another attack on our institutions, or the officers charged with defending them, will be met with certain and severe consequences. This weighs strongly in favor of incarceration.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Lamotta has shown a continuing disrespect for the rule of law. He has a criminal history that includes multiple firearm convictions, including one for carrying a firearm to a vote-counting location following the 2020 presidential election. After that arrest, Lamotta rebuked any responsibility, claiming on Facebook that, "We we're [sic] political-prisoners in Philly." Combined with his conduct on January 6, his history shows that Lamotta must be specifically deterred from similar conduct in the future.

Lamotta's lack of remorse for his actions on January 6—including specifically his social media postings—also weigh in favor a lengthy term. Lamotta has never accepted responsibility for what he did on January 6. In fact, he voiced his intent to continue violent actions against the

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

government when he referenced the Trojan Horse on Facebook.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Yvonne St. Cyr*, 22-CR-185 (JDB), Judge Bates sentenced the defendant to 33 months of incarceration following a jury conviction on two counts of violating 18 U.S.C. § 231(a)(3) and misdemeanors. Like Lamotta, St. Cyr refused to leave when instructed to by police officers: St Cyr forced her way to the front of the crowd, pushed her body against a police line barricade on the Lower West Plaza, and refused to move despite repeated police commands. Also like Lamotta, St. Cyr encouraged other rioters to endanger police: St. Cyr made her way into the Lower West Terrace tunnel where she climbed onto a ledge overlooking the melee, filmed the violence, and shouted at the crowd "we need fresh people" and "push, push, push." While Lamotta was convicted of only one count under § 231, where St. Cyr was convicted of two (and St. Cyr was found to have testified falsely at trial where Lamotta did not), the disparity between St. Cyr's 33-month sentence and the 21-month requested sentence adequately compensates for those factors.

In *United States v. Julio Baquero*, 21-CR-702 (JEB), Chief Judge Boasberg imposed 18 months of incarceration for a single violation of 18 U.S.C. § 231(a)(3) following a plea of guilty. Baquero entered the Capitol; joined a confrontation against officers, grabbing the hand of an officer holding a police baton; called the police "traitors"; and only departed when the police forced rioters out. Lamotta, unlike Baquero, did not accept responsibility for his criminal conduct, which accounts for the difference between the 18-month sentence Baquero received and the 21-

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

month sentence that is appropriate for Lamotta.

In *United States v. Kaleb Dillard,* 23-cr-49 (JMC), this Court sentenced the defendant to 10 months incarceration on one count of 18 U.S.C. § 111(a). Dillard, a former U.S. Marine, stormed the police line on the Rotunda Door and used a metal tool to smash in the window on the door. Dillard then pushed past police through the Rotunda Door to enter the Capitol. Upon entering, Dillard assaulted one of the officers attempting to close the Rotunda Door, grabbing the officer from behind and throwing the officer backwards onto the marble floor. Dillard then repeatedly shoved a second officer away from the doors in an effort to reopen the doors and allow more rioters to enter.

Although Dillard's assaultive conduct inside the Capitol is arguably more aggressive than Lamotta's, numerous factors present here warrant a greater sentence, most notably Lamotta's criminal history, highly inflammatory statements and conduct before January 6, and lack of remorse. First, Dillard's plea agreement stipulated to an offense level of 13 under U.S.S.G. § 2A2.4. Lamotta's guidelines calculation and offense level is the same, however, Lamotta's Criminal History Category of III puts him in the 18-24 month sentencing guidelines range, as opposed to Dillard's 12-18 month range for Criminal History Category I.

Lamotta's incendiary posts on social media also separate him from Dillard. On numerous occasions leading up to the November 2020 presidential election and subsequent certification of the vote, Lamotta spoke of civil war and hanging politicians. Moreover, Lamotta traveled form Virginia Beach to a vote counting location in Philadelphia with a firearm with the stated goal of "raiding" and "ambushing" ballots.

Finally, unlike Dillard, who pled guilty, Lamotta expressed no remorse for his actions.

After witnessing significant violence on January 6, including multiple assaults on law enforcement officers, Lamotta continued to post on social media advocating violence against the government. These aggravating factors warrant a greater sentence for Lamotta.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Lamotta was convicted of a violation of an offense under Title 18, and the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall"

impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, Lamotta's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

Because Lamotta in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Lamotta responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Lamotta to pay $2,000 in restitution for his convictions on Counts One, Four, and Five. This amount fairly reflects Lamotta's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 231(a)(3) (Count One) and 40 U.S.C. 5104(e)(2)(D) & (G) (Counts Four and Five) subject him to a statutory maximum fine of not more than $250,000 for Count One and not more than $5,000 for each of Counts Four and Five. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court

should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. *See* PSR ⁋ 103.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 21 months of imprisonment, at the midpoint of Lamotta's advisory Guidelines range, three years of supervised release, restitution of $2,000, and a mandatory assessment of $120 (consisting of $100 for Count 1, and $10 for each of Counts 4, and 5).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    */s/ Eric W. Boylan*
ERIC W. BOYLAN
Assistant United States Attorney
Texas Bar No. 24105519
610 D Street N.W.
Washington D.C. 20001
(202) 815-8608
eric.boylan@usdoj.gov

*/s/ Alexander Diamond*
ALEXANDER M. DIAMOND
NY Bar No. 5684634
Assistant United States Attorney
District of Columbia
601 D St. NW
Washington, DC 20530
(202) 506-0427
Alexander.Diamond@usdoj.gov

22